**In re REAPPORTIONMENT OF THE COLORADO GENERAL ASSEMBLY.**

No. 01SA386.

Supreme Court of Colorado,
En Banc.

Jan. 28, 2002.
Rehearing Denied Feb. 11, 2002.

**1238** ██

 ☞27(4.1)

nents Jennie Sanchez, Adeline Sanchez and Debra Cassanova.

Berenbaum, Weinshienk & Eason, P.C., Michael J. Belo, Martin D. Buckley, Denver, CO, Attorneys for Proponent Colorado AFL-CIO.

Berenbaum, Weinshienk & Eason, P.C., Charles A. Bewley, Denver, CO, Attorneys for Proponent Colorado Metro Citizens for Fair Reapportionment.

John H. Vigil, pro se, Arvada, CO, Representing Proponent John H. Vigil (Adams County Citizen).

Trimble, Tate & Nulan, P.C., Penfield W. Tate III, Lydia M. Tate, Denver, CO, Attorneys for Proponent Blacks for Fair Reapportionment.

Rothgerber Johnson & Lyons LLP, James M. Lyons, Douglas B. Tumminello, Thomas M. Rogers III, Denver, CO, Attorneys for Proponents Stan Matsunaka, President of the Colorado State Senate; Ed Perlmutter, President Pro Tem of the Colorado State Senate; and Bill Thiebaut, Majority Leader of the Colorado State Senate.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, CO, Burke & Neuwirth, P.C., Dean S. Neuwirth, Denver, CO, Attorneys for Proponent Timothy D. Knaus, Chairman of the Colorado State Democratic Party.

Ballard Spahr Andrews & Ingersoll, LLP, A. Thomas Downey, Denver, CO, Attorneys for Proponent Dan Grossman, Colorado House Minority Leader.

LeBoeuf, Lamb, Greene & MacRae, LLP, Robert N. Miller, Stephanie E. Dunn, Michael D. Smith, Denver, CO, Attorneys for Opposers Jeffrey M. Wells, Senator Mark D. Hillman, Richard P. "Sandy" Hume, Representative Mark Paschall and Heather M. Witwer (Colorado Reapportionment Commission Members).

Bullock Law Office, LLC, James R. Bullock, La Junta, CO, Attorneys for Opposers Estelle Thaller and Dan Sandoval.

Shawn Mitchell, Broomfield, CO, Mendenhall & Malouff, LLP, H. Barton Mendenhall, Rocky Ford, CO, Attorneys for Opposers Steve Olstad, James Martinez and Karen Nelson (Broomfield citizens).

Holme Roberts & Owen, LLP, Daniel J. Dunn, Manuel L. Martinez, Richard F. Rodriguez, Colorado Reapportionment Commission, Rebecca C. Lennahan, Jeremiah B. Barry, Denver, CO, Attorneys for the Proponent Colorado Reapportionment Commission.

Davis Graham & Stubbs LLP, Gale T. Miller, Denver, CO, Attorneys for Propo-

John Martin, Chairman Commissioner, pro se, Walt Stowe, Commissioner, pro se, Larry McCown, Commissioner, pro se, Don K. Deford, Glenwood Springs, CO, Attorney for Opposer Garfield County Board of County Commissioners.

Luis A. Corchado, Littleton, CO, Attorney for Opposer Colorado Hispanic Bar Association.

Hale Hackstaff Tymkovich, LLP, Allan L. Hale, Richard A. Westfall, Richard W. Dailey, Scott E. Gessler, Denver, CO, Attorneys for Opposers Betty Chronic, Richard P. Hume, William Swenson and Betty Swenson.

Hale Hackstaff Tymkovich, LLP, Allan L. Hale, Richard A. Westfall, Richard W. Dailey, Scott E. Gessler, Denver, CO, Attorneys for Opposers Richard P. Hume, Betty Chronic and William Berens (Boulder County Citizens).

Robert S. Gardner, Colorado Springs, CO, Attorney for Opposers Mark Sessions, Willie H. Breazell Sr., Lionel Rivera, Charles D. Broerman and Sarah Jack (El Paso County Citizens).

Susan Fey, pro se, Crestone, CO, Representing Opposers Towns of Crestone and Villa Grove.

Friedlob Sanderson Paulson & Tourtillott, P.C., Richard C. Kaufman, Christopher R. Paulson, Denver, CO, Attorneys for Opposers John Brackney, Andre Suharka and Citizens for Constitutional Maps.

Cathie Zarlingo, President, pro se, Mary K. Kalenian, Secretary, pro se, Grand Junction, CO, Representing Opposer Mesa County Valley School District No. 51 Board of Education.

Mesa County Attorney's Office, Maurice Lyle Dechant, Mesa County Attorney, Angela M. Luedtke, Assistant Mesa County Attorney, Grand Junction, CO, Attorneys for Opposer Mesa County Board of County Commissioners.

Reid & Scheffel, Mark H. Scheffel, Thomas J. Burke, Parker, CO, Attorneys for Opposer Douglas/Elbert Citizens for Fair State Senate Representation.

Richard O. Schroeder, Highlands Ranch, CO, Attorney for Opposer Don Lee.

Williams, Turner & Holmes, P.C., Mark A. Hermundstad, Grand Junction, CO, Attorneys for Opposer Ute Water Conservancy District.

R. Bruce Smith, Town Administrator, pro se, Collbran, CO, Representing Opposer Town of Collbran.

Carter & Sands, P.C., Stephen L. Carter, Rifle, CO, Attorneys for Opposer Town of Palisade.

Carter & Sands, P.C., Stephen L. Carter, Rifle, CO, Attorneys for Opposer City of Fruita.

Doyle, Zakhem, Suhre, & Lilly, LLC, Brett R. Lilly, John S. Zakhem, Denver, CO, Attorneys for Opposer Beth Gallegos (Adams County Citizen).

Arthur LeMelle, pro se, Gateway, CO, Representing Opposer Arthur LeMelle (citizen of the Town of Gateway).

Phil Mueller, President, pro se, Franktown, CO, Representing Opposer Elbert/Douglas County Livestock Association.

Joe Kline, Chairman, pro se, Glenwood Springs, CO, Representing Opposer Garfield County Republicans.

Raymond E. Smith, Chairman, pro se, Kremmling, CO, Representing Opposer Grand County Republicans.

John Ponikvar, Vice–Chairman, pro se, Craig, CO, Representing Opposer Moffat County Republican Central Committee.

Shirley J. Black, Chairman, pro se, Walden, CO, Representing Opposer Jackson County Republican Central Committee.

H. Olive Morton, Chair, pro se, Steamboat Springs, CO, Representing Opposer Routt County Republican Central Committee.

Jack Taylor, Colorado State Senator, pro se, Steamboat Springs, Representing Opposer Jack Taylor.

Don Davis, pro se, Ruby Davis, pro se, Clifton, CO, Representing Opposers Don Davis and Ruby Davis.

Justice HOBBS delivered the Opinion of the Court.

In this original proceeding under Article V, Section 48(1)(e) of the Colorado Constitution, we review the decennial Apportionment Plan (Adopted Plan) the Colorado Reapportionment Commission (Commission) approved for the reapportionment of Colorado General Assembly house and senate districts, based on the year 2000 federal census. We hold that the Adopted Plan does not comply with the criteria of Article V, Sections 46 and 47, of the Colorado Constitution because: (1) it is not "sufficiently attentive to county boundaries to meet the requirement of section 47(2)," *In re Reapportionment of the Colo. Gen. Assembly,* 647 P.2d 191, 195 (Colo.1982)(hereinafter *"In re Reapportionment 82"*); and (2) it is not accompanied by "an adequate factual showing that less drastic alternatives could not have satisfied the equal population requirement of the Colorado Constitution," *In re Reapportionment of the Colo. Gen. Assembly,* 828 P.2d 185, 195–96 (Colo.1992)(hereinafter *"In re Reapportionment 92–I"*). For example, the Adopted Plan denies whole senate districts to Boulder, Douglas, Jefferson, and Pueblo counties for which they qualify based on the year 2000 census data. In addition, the Commission has not advanced an adequate explanation for division of Adams, Arapahoe, and Mesa counties and the cities of Boulder and Pueblo between Senate Districts.

Because our role does not include redrawing the statewide apportionment map to comply with the applicable constitutional criteria, this being the Commission's responsibility, and because the Commission may choose to make other alterations in district boundaries on remand in redrawing the apportionment map, we set aside the Commission's action and remand the Adopted Plan to the Commission for further consideration, modification, re-adoption, and re-submittal by 5:00 p.m. on February 15, 2002.

## I.

### Reapportionment Law and Process

■ We commence our analysis by reviewing Colorado's reapportionment law and process. Reapportionment of the state's house and senate districts has always been a matter of great moment to Colorado citizens. Citizen-initiated statutes and constitutional amendments have shaped the law the Commission and this Court must follow to accomplish the 2002 reapportionment. The basic purpose of the constitutional standards for reapportionment is to assure equal protection for the right to participate in the Colorado political process and the right to vote. *In re Reapportionment 82,* 647 P.2d at 194.

### 1. Provisions of the Colorado Constitution

The Colorado Constitution as adopted in 1876 provided for twenty-six senate members and forty-nine house members until 1890, at which time the General Assembly could increase that number, not to exceed an aggregate of one hundred, with the ratio of senate to house seats being preserved as near as possible. Colo. Const. art. V, § 46 (amended 1950). The constitution allowed the General Assembly to alter district boundaries to include two or more counties but prohibited any county divisions: "No county shall be divided in the formation of a senatorial or representative district." Colo. Const. art. V, § 47 (amended 1962). The constitution provided for the apportionment of senators and representatives on the basis of federal and state census data "according to ratios to be fixed by law." Colo. Const. art. V, § 45 (amended 1962). The ratios did not include an equal population basis.

In *Armstrong v. Mitten,* 95 Colo. 425, 37 P.2d 757 (1934), we upheld a reapportionment statute the voters enacted after the General Assembly failed to adopt a reapportionment bill after the 1930 census. This act provided for thirty-five senate members and sixty-five house members, set the boundaries for the districts, and determined the number of senators and house members assigned to the districts. We rejected the argument that the people could not initiate a reapportionment statute. *Id.* at 430, 37 P.2d at 759.

In 1950, the voters approved a General Assembly-referred measure amending the constitution to limit the number of senators to thirty-five and the house to sixty-five members. Colo. Const. art. V, § 46 (amend-

ed 1962); 1951 Colo. Sess. Laws 553. Section 47 continued to provide that:

> Senatorial and representative districts may be altered from time to time, as public convenience may require. When a senatorial or representative district shall be composed of *two or more counties, they shall be contiguous, and the district as compact as may be. No county shall be divided in the formation of a senatorial or representative district.*

(Emphasis added.)

In 1962, through a General Assembly-referred measure, the voters amended the constitution to fix the General Assembly's membership at thirty-nine senate members and sixty-five house members, one to be elected for each senate and house district.[1] Colo. Const. art. V, § 45 (amended 1966); ch. 312, 1963 Colo. Sess. Laws 1045. The prohibition on dividing counties continued, with its wording slightly revised:

> Districts of the same house shall not overlap. All districts shall be as compact as may be and shall consist of contiguous whole general election precincts. No part of one county shall be added to another county or part of another county in forming a district. When a district includes two or more counties they shall be contiguous.

*Id.* The voters amended Section 46 to provide that the sixty-five house districts "shall be as nearly equal in population as may be." Colo. Const. art. V, § 46 (amended 1966); ch. 312, 1963 Colo. Sess. Laws 1045. Section 47 added an additional senator to Adams, Arapahoe, Boulder and Jefferson Counties and provided that the population in districts apportioned more than one senator "shall be as nearly equal in population as may be," but did not provide for equal population in the bulk of Colorado's senate districts. Colo. Const. art. V, § 47 (amended 1966); ch. 312, 1963 Colo. Sess. Laws 1045–46.

In 1964, the United States Supreme Court invalidated Colorado's reapportionment law for its allowance of an unequal population basis for senate districts, requiring instead that both houses reflect representation on a substantially equal population basis.[2] *See Lucas v. Forty–Fourth Gen. Assembly of Colo.,* 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). The Court held that Colorado's overall apportionment scheme was not "sufficiently grounded on population to be constitutionally sustainable under the Equal Protection Clause." *Id.* at 735, 84 S.Ct. 1459. The Court observed that adherence to a strict population basis was not a federal constitutional requirement; some deviation from a strict population basis is allowable, but Colorado's variation in population between districts was too substantial. *Id.* at 734–75, 84 S.Ct. 1459.

The General Assembly in 1964 attempted to comply with one person/one vote federal constitutional requirements. It adopted an act that divided counties into multiple senate and house districts. We held that Section 47 prohibited county divisions thus triggering the necessity of changing the Colorado Constitution for compliance with federal equal population requirements. " 'No county' cannot be construed as meaning that one county, or two counties, or three counties may be divided; it plainly directs that there is not one county in the state of Colorado that may be divided in the formation of a senatorial or representative district." *White v. Anderson,*

---

1. In 1961, the Legislative Council recommended increasing the number of General Assembly members in light of Colorado's growth. *See* Report to the Colorado General Assembly: Reapportionment of the Colorado General Assembly, Colorado Legislative Council Research Publication No. 52 (December 1961).

2. In 1956, the Colorado League of Women Voters had pointed out the wide divergence between populations of senate and house districts:

> In 1950, for example, a senator from Jefferson county represented almost 56,000 persons ... while the senator from the Fremont–Custer

County District ... represented less than 20,-000 persons ... [T]he state representative from the Cheyenne Lincoln county district represented less than 9,500 persons ... [I]n that year a state representative from Jefferson County represented almost 28,000 persons.

Reapportionment of the Colorado General Assembly, League of Women Voters of Colorado, Inc. 3 (September 1956). The League of Women Voters was instrumental in bringing the subsequent 1974 constitutional amendments for reapportionment to the ballot.

155 Colo. 291, 297–98, 394 P.2d 333, 336 (1964).

For the first time in Colorado, the 1966 citizen-initiated amendments to the constitution introduced: (1) a requirement of single member districts; and (2) allowed the General Assembly to add part of one county to all or part of another county in the formation of senate and house districts, if necessary to meet equal population requirements. *See* An Analysis of 1966 Ballot Proposals, Legislative Council of the Colorado General Assembly, Research Publication No. 110 at 9–10 (1966).

By the 1966 initiative, voters amended Section 45 to provide for not more than thirty-five senate members and sixty-five house members, one to be elected for each senatorial and each representative district. Colo. Const. art. V, § 45; ch. 456, 1967 Colo. Sess. Laws 11. The voters amended Section 46 to provide that each district in each house shall have "a population as nearly equal as may be, as required by the constitution of the United States." Colo. Const. art. V, § 46 (amended 1974); ch. 456, 1967 Colo. Sess. Laws 11. The voters reworded Section 47 to provide that the General Assembly could add one part of a county to all or part of another county in forming districts when declared by the General Assembly to be necessary to meet the equal population requirements of Section 46:

> Each district shall be as compact in area as possible and shall consist of contiguous whole general election precincts. Districts of the same house shall not overlap. *Except when declared by the general assembly to be necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts.* When county boundaries are changed, adjustments, if any, in legislative districts, shall be as prescribed by law.

Colo. Const. art. V, § 47 (amended 1974)(emphasis added).

Objectives of the 1966 amendments included making the members of the General Assembly more directly responsible to local constituencies.[3]

4. A single-member district system will enable a legislator to be aware of the sentiments of his constituents much more than a multi-member district system. In the urban areas, it will also mean that legislative candidates can concentrate their campaigns within a specific district area and can devote their time and attention to the people living within their district.

5. The single-member district system will mean that voters within a given area will have more effective control over the actions of their senator and representative. In other words, legislators may be held more directly accountable to their constituents under the single-member district system.

6. Under the provisions of Amendment No. 4, minority groups living in concentrated population areas should be better able to obtain representation in the General Assembly commensurate with their population. Under the system of at-large elections in multi-member counties, it is possible for many or all of the members to be elected, for example, from merely a few areas within a district or from generally the same economic strata.

An Analysis of 1966 Ballot Proposals, Legislative Council of the Colorado General Assembly, Research Publication No. 110 at 18 (1966).

Though reworded to comply with equal population criteria, Section 47 continued Colorado's historic preference for county-based local constituencies; counties were to remain whole except as necessary for compliance with equal population requirements. "The Constitution just as strongly expressly prohibits a part of one county being added to all or part of another county except when necessary to meet the equal population requirements of Article V, Section 46 of the Colora-

---

**3.** The 1960s were a key period for Colorado reapportionment law. A 1967 report of the Legislative Council to the General Assembly chronicles the court decisions, General Assembly bills, and constitutional amendments between 1961 and 1967. *See* Summary of Congressional Districting and Legislative Reapportionment Action in Colorado: 1961–1967, Legislative Council Report to the Colorado General Assembly, Research Publication No. 125 (May 1967).

do Constitution." [4] *In re Interrogatories H.R. 1020,* 178 Colo. 311, 313, 497 P.2d 1024, 1025 (1972). In 1972, we also held that inclusion of enclaves in a district is a direct violation of the constitutional requirements of contiguity and compactness. *See In re Interrogatory H.J.R. 1011,* 177 Colo. 215, 217–18, 493 P.2d 346, 347 (1972)(prohibiting inclusion of Glendale and Holly Hills-portions of Arapahoe County surrounded by the City and County of Denver-into the Arapahoe County senate district).

In 1974, the voters approved a citizen-initiated constitutional amendment creating the Reapportionment Commission to perform the work of reapportionment the constitution had formerly consigned to the General Assembly. The basic purpose of the initiative was to accomplish reapportionment through the work of an independent body of Colorado citizens appointed by leaders of Colorado's legislative, executive, and judicial branches. The initiative designed a process for the Commission's work, criteria for carrying out that work, and review by this court of the Commission's product. The Legislative Council Analysis of this proposal stated that it would accomplish the following, if adopted:

1. Remove from the General Assembly the power to reapportion itself or to revise legislative district boundaries. After each federal census (presently conducted every ten years), an eleven member commission would assume responsibility for establishing district boundaries for the General Assembly. The commission would consist of: (a) the Speaker and Minority Leader of the state House of Representatives and the Majority and Minority Leaders of the state Senate (or the designees of these legislative leaders); (b) three appointees of the Governor; and (c) four appointees of the Chief Justice of the Colorado Supreme Court.

2. Allow no more than a five percent deviation between the most populous

districts in each house of the General Assembly.

3. Require that " . . . the aggregate linear distance of all district boundaries shall be as short as possible."

4. Encourage the preservation of communities of interest (including ethnic, cultural, economic, trade area, geographic, and demographic factors) within a single district whenever possible, and discourage the splitting of cities and towns between districts.

5. Require publication of a preliminary reapportionment plan and public hearings on this plan in several areas of the state.

6. Provide for automatic review and ultimate approval of the reapportionment plan by the Colorado Supreme Court.

Concerning Amendment No. 9, Legislative Council of the Colorado General Assembly, An Analysis of 1974 Ballot Proposals, Research Publication No. 206 (1974) at 26–27.

Arguments for the Proposal explained the amendment's provision for a maximum allowable five-percent deviation between the district with the greatest population and the least population in each house. It would (1) "allow greater flexibility in the location of small cities and towns within single legislative districts and . . . make it easier to avoid splitting counties between legislative districts," and (2) "permit more consideration of the ethnic, cultural, economic, and other aspects of reapportionment. . . ." *Id.* at 29.

*The maximum population deviation of five percent between districts* is a reasonable standard which will allow greater flexibility in the location of small cities and towns within single legislative districts and which *will make it easier to avoid splitting counties between legislative districts.* The use of a five percent deviation would also permit more consideration of the ethnic, cultural, economic, and other aspects of reapportionment called for in the proposal.

---

4. A Legislative Council Committee construing the 1966 constitutional amendments formulated guidelines for General Assembly redistricting bills. In regard to counties, one of the guidelines stated:

County boundaries should remain intact except where necessary to achieve equal population representation goals.
1967 Legislative Research Publication No. 125 at 12.

*Id.* at 29 (emphasis added). Objectives of the proposed constitutional amendment included reducing both partisan politics and gerrymandering:

> The proposal would *reduce the impact that partisan politics can have on the drawing of legislative district boundaries,* through the placement of the commission outside the legislative branch and through the requirements for appointment of commission members by all three branches of state government. *The proposal's more stringent requirements for consideration of communities of interest, for compact districts, and for minimization of the splitting of ·cities and towns,* and the public visibility of the activities of the reapportionment commission would tend to *reduce the gerrymandering of legislative districts.*

*Id.* at 29–30 (emphasis added).

The Colorado voters approved the citizen proposal, and we upheld it over a competing General Assembly-referred measure that received a lesser number of votes in the 1974 election. *See In re Interrogatories Propounded by the Senate Concerning House Bill 1078,* 189 Colo. 1, 536 P.2d 308 (1975). The 1974 constitutional amendments built on prior Colorado reapportionment law, most particularly on the 1966 citizen-initiated constitutional amendments. The 1974 amendments carried forth the prohibition in Section 47 against addition of parts of one county to another in establishing districts, except as necessary to meet the equal population requirements of Section 46.

The current constitutional requirements applicable to the Commission's work, Adopted Plan, and our review of it, are set forth in Sections 46 and 47 of Article V as follows:

### Section 46. Senatorial and representative districts.

The state shall be divided into as many senatorial and representative districts as there are members of the senate and house of representatives respectively, each district in each house having a population *as nearly equal as may be, as required by the constitution of the United States, but in no event shall there be more than five percent deviation between the most populous and the least populous district in each house.*

### Section 47. Composition of districts.

(1) Each district shall be as compact in area as possible and the aggregate linear distance of all district boundaries shall be as short as possible. Each district shall consist of contiguous whole general election precincts. Districts of the same house shall not overlap.

(2) *Except when necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts.* Within counties whose territory is contained in more than one district of the same house, the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible. When county, city, or town boundaries are changed, adjustments, if any, in legislative districts shall be as prescribed by law.

(3) *Consistent with the provisions of this section and section 46 of this article, communities of interest,* including ethnic, cultural, economic, trade area, geographic, and demographic factors, *shall be preserved within a single district wherever possible.*

(Emphasis added.)

Since the adoption of the 1974 initiative, we have reviewed the Commission's 1982 and 1992 reapportionment plans. *See In re Reapportionment 82,* 647 P.2d at 198 (returning plan to Commission based upon unconstitutional sequencing of elections in two senate districts, because one senate district encompassed residences of two incumbent state senators while a second senate district lacked a state senator); *In re Reapportionment of the Colo. Gen. Assembly,* 647 P.2d 209 (Colo.1982)(rejecting resubmitted plan as less consistent with the hierarchy of constitutional criteria than the previously submitted plan and ordering the Commission to submit the original plan with the court-ordered election sequencing modifications); *In re Reapportionment 92–I,* 828 P.2d at 185 (returning plan to Commission because it divided Pitkin County and the City of Aspen, and the Commission's explanation "did not

rise to the level of an adequate factual showing that less drastic alternatives could not have satisfied the equal population requirement of the Colorado Constitution." The court also disapproved the Commission's division of the Perry Park community and its failure to incorporate requested technical changes to Larimer and Boulder County districts); *In re Reapportionment of the Colo. Gen. Assembly*, 828 P.2d 213 (Colo.1992)(approving the resubmitted plan because it incorporated all of the court's requested changes except for the division of Pitkin County, which was found constitutional because the Commission provided the court with "a sufficient basis for judicial review of its actions and reasons for the necessity that Pitkin County be divided."). On both occasions, in applying the constitutional criteria, we found a significant deficiency in the Commission's action that required remand for plan modification, factual demonstration, and articulated rationale. Upon revision and resubmission, we approved both reapportionment plans and they became final.

In 1996, the United States Court of Appeals for the Tenth Circuit ordered the adoption of a remedial plan to redraw the boundaries of a House District for the San Luis Valley, in order to provide its substantial Hispanic population with a fair opportunity to elect representatives of their choice. *See Sanchez v. Colorado*, 97 F.3d 1303 (10th Cir. 1996). In 1998, the General Assembly approved the redrawing of house districts in the south central portion of the State to comply with *Sanchez. See* § 2-2-208, 1 C.R.S. (2001).

These legal developments in the course of Colorado's growth have shaped the Commission's 2002 reapportionment responsibilities, as well as our own.

### 2. The 2002 Reapportionment Process

In carrying out its 2002 reapportionment responsibilities, the Commission held fourteen meetings from May 11, 2001 through August 30, 2001 to arrive at its Preliminary Plan. The 2002 federal census, which propels reapportionment, reported a Colorado population of 4,301,261 persons. Based thereon, the Commission determined that the ideal population for a senate district is 122,893 persons and for a house district 66,173 persons.

The Commission convened twenty-two public hearings throughout the State to receive public comment on its Preliminary Plan. The Commission met four times to draft the final plan and completed the Adopted Plan on November 27, 2001. The Commission approved the house component of the Adopted Plan on a 10-1 vote. It approved the senate component of the Adopted Plan on a 6-5 vote. On a 7-4 vote, the Commission agreed to submit a comparison alternative to us, at the request of five commissioners.

Pursuant to our scheduling order, the Commission and proponents of the Adopted Plan filed their opening briefs and supporting material by December 17, 2001. Opponents of the Adopted Plan answered by December 27, 2001. The Commission and proponents replied by January 3, 2002. We heard oral arguments for and against the Adopted Plan on January 7, 2002.

The Constitution provides that our review and determination shall take precedence over other matters. In the event we disapprove the Adopted Plan, the Commission shall revise and resubmit the plan consistent with our opinion. Colo. Const. art. V, § 48(1)(c).

### II.

We hold that the Adopted Plan does not comply with the criteria of Article V, Sections 46 and 47, of the Colorado Constitution because: (1) it is not "sufficiently attentive to county boundaries to meet the requirement of section 47(2)," *In re Reapportionment 82*, 647 P.2d at 195; and (2) it is not accompanied by "an adequate factual showing that less drastic alternatives could not have satisfied the equal population requirement of the Colorado Constitution," *In re Reapportionment 92–I*, 828 P.2d at 195–96. For example, the Adopted Plan denies whole senate districts to Boulder, Douglas, Jefferson, and Pueblo counties for which they qualify based on the year 2000 census data and the Commission's ideal district projection. In addition, the Commission has not advanced an

adequate explanation for division of Adams, Arapahoe, and Mesa counties and the cities of Boulder and Pueblo between Senate Districts.

## A.

### Standard of Review

■ Our role in reviewing the Commission's reapportionment action is narrow. *In re Reapportionment 92–I*, 828 P.2d at 189. We must determine whether the Commission followed the procedures and applied the criteria of federal and Colorado law in adopting its reapportionment plan for Colorado General Assembly house and senate districts. We do not redraw the reapportionment map for the Commission. *In re Reapportionment 82*, 647 P.2d at 194. "Our role in this proceeding is a narrow one: to measure the present reapportionment plan against the constitutional standards. The choice among alternative plans, each consistent with constitutional requirements, is for the Commission and not the Court." *Id.* (footnote omitted).

■ We uphold the adopted plan if it meets the applicable federal and Colorado standards. *Id.* at 197. "Although we might make different choices were we in the Commission's place, we should not substitute our judgment for the Commission's unless we are convinced the Commission departed from constitutional criteria." *Id.*

■ The Fourteenth Amendment, Fifteenth Amendment, and section 2 of the Voting Rights Act, superimpose federal requirements on the Colorado constitutional criteria. In order of priority, we have set forth the federal and state criteria as follows:

(1) the Fourteenth Amendment Equal Protection Clause and the Fifteenth Amendment; (2) section 2 of the Voting Rights Act; (3) article V, section 46 (equality of population of districts in each house); (4) article V, section 47(2)(districts not to cross county lines except to meet section 46 requirements and the number of cities and towns contained in more than one district minimized); (5) article V, section 47(1)(each district to be as compact as possible and to consist of contiguous whole general election precincts); and (6) article

V, section 47(3) (preservation of communities of interest within a district).

*In re Reapportionment 92–I*, 828 P.2d at 190 (footnotes omitted). Substantively, the Commission is to apply all six of the criteria; procedurally, the Commission is to apply the criteria in order of their stated preference in adopting the final reapportionment plan for the state of Colorado. *Id.* (describing the listing of these criteria as a "hierarchy from the most to the least important"); *see also In re Reapportionment of the Colo. Gen. Assembly*, 647 P.2d 209, 210 (Colo.1982)("The Colorado Constitution lists a hierarchy of criteria for measuring the adequacy of a reapportionment plan.").

■ The Adopted Plan achieves constitutional compliance and becomes the Final Plan when it reflects the above-listed criteria. The plan becomes final after we have completed our review and approve it. Colo. Const. art. V, § 48(1)(c). The Commission may not apply the lesser criteria over the greater criteria, but it may use the lesser criteria after satisfying the greater criteria. *In re Reapportionment 92–I*, 828 P.2d at 194. The Commission resolves conflicts by applying the criteria in preferential order, articulating on submittal to us how the Adopted Plan reflects the criteria. *In re Reapportionment 82*, 647 P.2d at 194.

■ The six criteria set forth the context in which the Commission works, from the proposal of a Preliminary Plan for public comment to formulation of its Adopted Plan. If the Commission faces actual or probable federal law violations, its starting point for the Approved Plan is compliance with federal law. *In re Reapportionment 92–I*, 828 P.2d at 193. The Commission then proceeds to apply the Colorado constitutional criteria. If federal law issues are not present, the Commission proceeds directly to the Colorado criteria and applies them according to their preferential order. The process of drawing maps to comply with the constitution is reiterative in nature, leading to the Adopted Plan being submitted to this court.

### 1. Equal Population

■ Obtaining substantial equality of population among districts, as required by Arti-

cle V, Section 46, is the "paramount criterion for testing the constitutional sufficiency of a reapportionment plan." *In re Reapportionment 82*, 647 P.2d at 193; *see Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)(holding that the Equal Protection Clause requires that both houses of a bicameral state legislature must be apportioned substantially on a population basis, also known as the "one person, one vote" rule); *Lucas*, 377 U.S. at 736, 84 S.Ct. 1459 (holding that the Fourteenth Amendment demands substantial equality of population between districts so that each person's vote is substantially equal to another person's vote). Article V, Section 46, of the Colorado Constitution sets forth the equal population criteria for reapportionment of the Colorado General Assembly:

> The state shall be divided into as many senatorial and representative districts as there are members of the senate and house of representatives respectively, each district in each house having a population *as nearly equal as may be*, as required by the constitution of the United States, *but in no event shall there be more than five percent deviation between the most populous and the least populous district in each house.*

Colo. Const. art. V, § 46 (emphasis added).

The five percent deviation allowance of Section 46 between the most populous district and the least populous district in each house allows the Commission to work towards keeping counties intact, if possible, in shaping a final reapportionment plan through application of the Section 47 criteria. The equal population requirement is satisfied if the "sum of the percent by which the largest district's population exceeds that of the ideal district and the percent by which the smallest district's population falls short of the population of the ideal district" is less than five percent. *In re Reapportionment 82*, 647 P.2d at 193 n. 4.

### 2. County Considerations

Article V, Section 47(2) of the Colorado Constitution favors matching districts to county boundaries and not crossing county boundaries unless necessary to comply with Section 46. "The most important concern under section 47 is whether the Final Plan unnecessarily divides counties or cities within counties." *In re Reapportionment 92–I*, 828 P.2d at 194. Colorado's apportionment law since 1876 has been consistent in this regard. Counties are a basic structural unit of local government for carrying out state purposes. Counties and the cities within their boundaries are already established as communities of interest in their own right, with a functioning legal and physical local government identity on behalf of citizens that is ongoing. Counties have a preferential status under Section 47 over those communities of interest the Commission postulates during its decennial reapportionment process when it must divide a county and join a part of it to another county, or part of another county, to form a district in order to comply with the equal population criteria of Section 46.

A direct line of accountability between citizens, their elected city councils and county commissioners, and their elected state representatives is at the heart of responsive government in Colorado and is built into the county-oriented design of the Constitution's reapportionment provisions. "The constitution allows the Commission to divide a county *only if necessary* to meet the equal population requirement." *In re Reapportionment 82*, 647 P.2d at 197 (emphasis added). "By its express language, section 47(2) subordinates the importance of not dividing counties to the substantial equality of population mandate of section 46." *Id.* at 193–94. Article V, Section 47(2) states as follows:

> *Except when necessary to meet the equal population requirements of section 46,* no part of one county shall be added to all or part of another county in forming districts. Within counties whose territory is contained in more than one district of the same house, the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible. When county, city, or town boundaries are changed, adjustments, if any, in legislative districts shall be as prescribed by law.

Colo. Const. art. V, § 47(2)(emphasis added).

These provisions contemplate that the integrity of county constituent rep-

resentation in the General Assembly will be respected whenever possible. We therefore construe Section 47(2) as requiring the Commission to assign whole districts to counties whose population qualifies for them based on the decennial census population and the Commission's ideal district population projection. The Commission's Adopted Plan must be: (1) "sufficiently attentive to county boundaries to meet the requirement of section 47(2)," *In re Reapportionment 82,* 647 P.2d at 195; and (2) accompanied by "an adequate factual showing that less drastic alternatives could not have satisfied the equal population requirement of the Colorado Constitution," *In re Reapportionment 92–I,* 828 P.2d at 195–96. The requirement of a factual showing guards against creating unnecessary county divisions.

In complying with the Section 46 criteria, the Commission projects an ideal equal population figure for Colorado house and senate districts. The Commission divides Colorado's total population by the number of legally allotted districts to be created: sixty-five house districts and thirty-five senate districts. Colo. Const. art. V, § 45 ("The general assembly shall consist of not more than thirty-five members of the senate and of not more than sixty-five members of the house of representatives....").

In formulating the apportionment map, the Commission's actions thus include: (1) determining the ideal population for Senate and House districts; (2) identifying those counties that qualify for whole Senate or House districts based upon their population; and (3) preserving to them their number of whole districts throughout the process unless this is not possible. In regard to the other counties and portions of counties that do not qualify for a whole district, the Commission then employs the further criteria of Article V, Section 47 in making county divisions to form districts: keeping divisions of cities and towns between districts to a minimum, compactness, contiguity and preservation of communities of interest, in that order. *In Re Apportionment 92–I,* 828 P.2d at 190.

Because of the necessity to meet federal equal population requirements, we have recognized that "perfection is not obtainable" in regard to the Final Plan for reapportionment; "[a]n addition or deletion in one area of the state necessarily causes alteration in another." *In re Interrogatories H.R. 1020,* 178 Colo. at 313, 497 P.2d at 1025 (commenting on the General Assembly's 1972 apportionment plan that contained county divisions). The "if necessary" exception of Section 47(2) permits the Commission to add a portion of a county to another county or portion of another county to form a district upon "an adequate factual showing that less drastic alternatives could not have satisfied the equal population requirement of the Colorado Constitution." *In re Reapportionment 92–I,* 828 P.2d at 195–96; *see also In re Interrogatories H.R. 1020,* 178 Colo. at 313, 497 P.2d at 1025 (observing, "[T]he General Assembly made findings when it was necessary to cross county lines to meet the command of Section 46 in forming the districts.").[5]

Guided by the constitutional criteria, we now turn to the Commission's Adopted Plan. Our review focuses on the senate portion of the Adopted Plan, for it presents issues of constitutional compliance that either are not present in the house portion of the plan or will be addressed in rectifying the non-complying county divisions.

### B.

### The Adopted Plan

#### 1. Douglas, Pueblo, Boulder, and Jefferson Counties

■ Based upon the 2000 census, the ideal population for each house district is 66,173 persons and for each senate district is 122,893 persons. The Adopted Plan denies Douglas, Pueblo, Boulder and Jefferson Counties whole senate districts within their boundaries for which they qualify based upon the Commission's ideal population projection. We have prepared the following chart to illustrate this.

---

**5.** We emphasized in *In re Interrogatories H.R. 1020,* 178 Colo. at 313, 497 P.2d at 1025, that the General Assembly had kept counties intact where it could meet population requirements and, in doing so, "some degree of compactness was permissibly sacrificed."

The chart depicts only those counties qualifying for whole senate districts within their boundaries. The chart arrays the number of whole districts these counties qualify for, in comparison to the number of whole counties the Commission allotted them. Underscoring in the chart shows the discrepancy between the number of whole senate districts the county qualified for based on its population, in contrast to the number the Adopted Plan allocates to it. The materials before us on review contain two alternatives that the Commission had before it. The chart portrays the number of whole districts the alternative plans would allocate to each of these counties. Because we cannot draw the apportionment map for the Commission, we employ the alternative plans only for comparison purposes to show the availability of less drastic alternatives to the Adopted Plan in regard to county divisions.

| | | | Whole Senate District Allocations: [6] | | |
|---|---|---|---|---|---|
| County | Total Population | 2000 Census | Adopted Plan | Rodriguez 5 Alt. | Wells 37 Alt. |
| Adams | 363,857 | 2.96 | 2 | 2 | 2 |
| Arapahoe | 487,967 | 3.97 | 3 | 4 | 4 |
| Boulder | 291,288 | 2.37 [7] | 1 | 1 | 2 |
| Denver | 554,636 | 4.51 | 4 | 4 | 4 |
| Douglas | 175,766 | 1.43 | 0 | 1 | 1 |
| El Paso | 516,929 | 4.21 | 4 | 4 | 4 |
| Jefferson | 527,056 | 4.29 | 3 | 3 | 4 |
| Larimer | 251,494 | 2.05 | 2 | 2 | 2 |
| Pueblo | 141,472 | 1.15 | 0 | 1 | 1 |
| Weld | 180,936 | 1.47 | 1 | 1 | 1 |

The Adopted Plan divides Douglas County between Senate Districts 2 and 30. Senate District 2 combines part of Douglas County with Elbert, Kit Carson, Lincoln, and Washington Counties. Senate District 30 combines part of Douglas County with part of Arapahoe County. The Adopted Plan divides Pueblo County between Senate Districts 3 and 4. Senate District 3 combines part of Pueblo County with Baca, Bent, Cheyenne, Crowley, Kiowa, Las Animas, Otero, and Prowers Counties. Senate District 4 combines part of Pueblo County with part of El Paso County.

The Commission explains that the Douglas County and Pueblo County divisions are the product of drawing the Adopted Plan starting with plains counties at Colorado's eastern border to form three senate "plains districts," then working west. When the Commission arrived at the populous front range,

"equal population requirements" drove the Douglas County and Pueblo County divisions. The Commission's starting point thereby had the effect of painting the Commission into a corner when it arrived at district line drawing of the populous Eastern Slope counties:

> One hallmark of the Final Plan for the Senate is the creation of three Senate districts on the eastern plains. All three districts keep rural counties whole and extend from the Kansas border to the growing communities of the Front Range. Equal population requirements drive the split of Weld County in district 1, Douglas County in district 2, and Pueblo County in district 3. ...
>
> Having finished district 3 in Pueblo county and having made the decision to keep all counties whole in district 5, the only choice left for the Commission to

**6.** The 2000 Census column reflects the number of whole senate districts a county would be entitled to based upon the Commission's ideal population projection for a senate district. The Adopted Plan column reflects the number of whole senate districts the Adopted Plan allots to these counties. The Rodriguez 5 alternative and Wells 37 alternative columns reflect the number of whole senate districts these plans would allot.

**7.** Deducting the population of the newly-created City and County of Broomfield, Boulder County is entitled to 2.20 senate districts based on the ideal population projection for a senate district.

*achieve equal population in district 4 was to add a portion of El Paso County to the remaining portion of Pueblo County.* District 4 preserves the many common interests shared by northwestern Pueblo and southern El Paso counties (such as the I-25 transportation corridor, the growth issues facing front range communities, and their similar socio-economic characteristics). . . .

*The portion of Douglas County left over after completing district 2 was too small to form its own district and therefore it was added to the remaining population in Arapahoe County* to form district 30.

Legal Memorandum and Explanatory Materials in Support of Final Plan for Districts in the Senate and House of Representatives, 16–21 (emphasis added). The Commission justified the Douglas County and Pueblo County divisions on a community of interest extending from Colorado's eastern border into portions of urban and suburban front range populations.

The Adopted Plan divides Boulder County between Senate Districts 18 and 19. Senate District 18 combines part of Boulder County with parts of Adams, Jefferson, and Weld Counties. Senate District 19 combines part of Boulder County with part of Jefferson County, Clear Creek and Gilpin Counties. The Commission again relied on a community of interest rationale to justify the Boulder County division:

> The Final Plan honors the boundaries of Broomfield by keeping it whole in district 18. *Since Broomfield's population of approximately 40,000 is far lower than the ideal, part of a neighboring county had to be added to complete the district. The Commission decided to draw from Boulder County for this purpose and combined Broomfield with Superior and the southern portion of the City of Boulder.* These communities are all located along the Denver–Boulder Turnpike and share transportation and growth concerns. . . .

Boulder County's population, prior to the creation of Broomfield, entitled it to 2.37 Senate seats. After deducting the Boulder County population used to finish district 18, Boulder County is entitled to 1.5 districts. The full district is district 17, which unites the east Boulder County communities of Longmont, Louisville, Lafayette, and Erie. *The Commission combined the remainder of Boulder County with Clear Creek and Gilpin counties and the unallocated portion of Jefferson County to form district 19.* District 19 encompasses many of the foothills communities.

*Id.* at 18–19 (emphasis added).

The Adopted Plan divides Jefferson County between Senate Districts 19 and 23. Senate District 19 combines part of Jefferson County with part of Boulder County, Clear Creek and Gilpin Counties. Senate District 23 combines parts of Jefferson and Adams Counties. The Commission justified the Jefferson County division on the basis of equal population constraints and the need to minimize division of the City of Westminster:

> Districts 22, 21, and 20 work their way from south to north along the Douglas/Arapahoe/Denver boundary shared with Jefferson County. The northernmost district, district 23, crosses into Adams County to achieve equal population and to make it possible to include Westminster in only two Senate districts (districts 23 and 26). The irregular boundary on the north side of district 23 is caused by the boundary of the City and County of Broomfield.

*Id.* at 18.

It therefore appears from the Commission's rationale that it considered itself at liberty to start the cartography of reapportionment at any point of Colorado geography it might choose. Because of this approach, the Commission faced the consequence of county divisions that appear inevitable to meet equal population requirements. But, the constitutional criteria instead contemplate the Commission taking an overview of Colorado's population by county, then generating a map that respects the state's legal preference for county integrity, then applying minimization of city divisions, compactness, contiguity, and community of interest criteria to add portions of counties to other counties in forming districts, when necessary.

▪ The Commission relies on a community of interest rationale to support denying

whole county seats to counties that qualify for them, but this is the least weighty of the Section 46 and 47 criteria. The Commission's reordering of the criteria offends the constitution. *In re Reapportionment 82*, 647 P.2d at 194. While the Commission has discretion to make necessary compromises, *In re Reapportionment 92–I*, 828 P.2d at 195–96; *In re Reapportionment 82*, 647 P.2d at 197, it cannot advance the lesser community of interest criteria over the greater requirement not to make county divisions unless necessary to meet equal population requirements.

That the Final Plan—yet to be established—can more certainly conform to the constitutional criteria than the Adopted Plan is demonstrated by the Rodriguez 5 senate alternative and the Wells 37 senate alternative. Each reveals the availability of less drastic county division alternatives. Both illustrate that Douglas and Pueblo Counties can have one whole senate district entirely within their boundaries, apparently within the Section 46 equal population no more than five percent deviation criteria. The Wells 37 senate alternative also illustrates the availability of providing Boulder County with two whole senate districts and Jefferson County with four whole senate districts.

2. Adams, Arapahoe, and Mesa Counties

▬▬▬ Adams and Arapahoe Counties are very close to qualifying for an additional senate district located entirely within their boundaries. The above chart demonstrates that Adams qualified for .96 of an additional senate district. Arapahoe County appears to qualify for .97 of an additional senate district; however, the Arapahoe County figure must be adjusted downward because Glendale and Holly Hills are Arapahoe County enclaves within the City and County of Denver's

boundaries and are not contiguous to the rest of Arapahoe County. *In re Interrogatory H.J.R. 1011*, 177 Colo. at 218, 493 P.2d at 348 (1972). Mesa County qualifies for .95 of a senate district.[8]

Instead of allotting these counties an additional senate district, the Adopted Plan divides the counties to form districts with other counties. Given Colorado's constitutional preference for keeping counties intact in a district, if possible unless equal population considerations require otherwise, the Commission on remand should attempt to create an additional district for Adams County and for Arapahoe County, and a district for Mesa County.

The Rodriguez 5 senate alternative would provide Arapahoe County with four senate districts, the number of whole senate districts it nearly qualifies for based upon population. The Rodriguez 5 senate alternative and Wells 37 senate alternative both keep Mesa County whole by adding a portion of Delta County in order to complete this district. Alternative plans illustrate how these counties can be divided in a constitutionally preferred manner. Because we remand the Adopted Plan for other reasons, we also require the Commission to reexamine the Adams, Arapahoe, and Mesa County divisions. If it is still necessary to make one, some, or all of them, then the Commission must make an adequate factual demonstration and articulate its rationale for the divisions, upon resubmission.

3. City of Boulder and City of Pueblo

▬▬▬ The Adopted Plan divides the City of Boulder into Senate Districts 18 and 19 and the City of Pueblo[9] into Senate Districts 3 and 4. The Commission relied on a preser-

---

**8.** An addition to the above chart demonstrates this:

| County | Total Population | 2000 Census | Adopted Plan | Rodriguez 5 Alt. | Wells 37 Alt. |
|--------|-----------------|-------------|--------------|------------------|---------------|
| | | | **Whole Senate District Allocations:** | | |
| Mesa | 116,255 | 0.95 | 0 | 1 | 1 |

**9.** The Preliminary Plan distributed to the public at the hearings throughout Colorado, and in the City of Pueblo, showed the City of Pueblo as

being within a single senate district.

vation of communities of interest and equal population rationale in justification of these city divisions. The argument is not persuasive. Article V, Section 47(2) states in part:

> Within counties whose territory is contained in more than one district of the same house, *the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible.*

(Emphasis added.)

It is apparent from the alternative plans that less drastic alternatives exist that would keep the cities intact, as illustrated by the Rodriguez 5 and Rodriguez 6 senate alternatives and the Commission's Preliminary Plan it took to public hearing. *In re Reapportionment 92–I*, 828 P.2d at 195–96. In addressing whole senate districts for Boulder and Pueblo Counties on remand, the Commission should avoid these city divisions, if possible.

### C.

Opposers make several other objections to the Adopted Plan.[10] The Douglas/Elbert Citizens for Fair State Senate Representation argue that, if the mathematical deviation between the most and least populous senate district contained in the Adopted Plan is calculated to three decimal places, the deviation is 5.001 percent, 0.001 above the Colorado constitutional limit. On remand, the Commission has the opportunity to address this technical infraction; thus, we do not reach this issue here.

The remaining arguments raised in opposition to the Adopted Plan concern decisions which are within the Commission's discretion. "Our role in this proceeding is a narrow one: to measure the present reapportionment plan against the constitutional standards. The choice among alternative plans, each consistent with constitutional requirements, is for the Commission and not the Court." *In re Reapportionment 82*, 647 P.2d at 194 (footnote omitted). Issues concerning compactness, communities of interest, and which plan is preferred by a certain group of citizens, must remain within the scope of the Commission's discretion. We do not redraw the reapportionment map for the Commission. *Id.*

The Colorado Hispanic Bar Association objects to House Districts 63 and 65 of the Adopted Plan. It argues that the boundary between House Districts 63 and 65 divides a large Hispanic community located across the border between Weld and Morgan Counties. Susan Fey objects to the Adopted Plan's failure to include Crestone and Villa Grove in House District 60. John H. Vigil requests that his portion of unincorporated Adams County should be included with the rest of unincorporated Adams County in Senate District 24, rather than with Arvada in Senate District 19. The Elbert/Douglas County Livestock Association requests that Elbert and a portion of Douglas County be contained in a single senate district. Douglas/Elbert Citizens for Fair State Senate Representation object to the division of the Highlands Ranch community and the inclusion of Elbert County in Senate District 2.

---

10. The following arguments have already been addressed by this opinion: Jeffry M. Wells, Sen. Mark D. Hillman, Richard P. "Sandy" Hume, Rep. Mark Paschall, and Heather M. Witwer argue that the Adopted Plan unnecessarily divides Arapahoe, Douglas, Boulder, and Jefferson Counties, unnecessarily divides the Cities of Boulder and Pueblo, and fails to preserve ethnic and rural communities of interest; John Brackney, Andre Suharka and Citizens for Constitutional Maps request that four whole senate districts be located within Arapahoe County; Estelle Thaller and Dan Sandoval object to the Adopted Plan's division of the City of Pueblo, and argue that Senate Districts 2 and 3 fail to protect rural communities of interest; Beth Gallegos objects to the Adopted Plan's division of Adams County and Thornton between senate districts, and argues

that the Adopted Plan is not as compact as possible and does not preserve ethnic communities of interest; Steve Olstad, James Martinez, and Karen Nelson object to Senate District 18 of the Adopted Plan because it divides Boulder County and the City of Boulder; Richard P. Hume, Betty Chronic, and William Berens object to the Adopted Plan's division of the City of Boulder between Senate Districts 18 and 19; the following individuals and communities objected to the division of Mesa County between Senate Districts 7 and 8 in the Adopted Plan: City of Fruita, Town of Palisade, Mesa County Valley School District 51 Board of Education, Town of Collbran, Ute Water Conservancy District, Mesa County Board of County Commissioners, Don Davis and Ruby Davis.

Mark Sessions, Willie H. Breazell, Sr., Lionel Rivera, Charles D. Broerman, and Sarah Jack object to the addition of a portion of El Paso County to a portion of Pueblo County in order to form Senate District 4. These opposers also argue that Senate District 11 violates compactness and community of interest criteria, and House District 18 fails to preserve communities of interest. Betty Chronic, Richard P. Hume, William Swenson, and Betty Swenson object to the Adopted Plan's division of the City of Boulder between House Districts 10, 11, and 13.[11]

The Garfield County Board of County Commissioners objected to the Adopted Plan's realignment of House Districts 57 and 61. Garfield County Republicans object to the division of Garfield County between House Districts 57 and 61 in the Adopted Plan. Grand County Republicans prefer the "Wells 35 Plan" and "Preliminary House District 57" to the Adopted Plan. Jackson County Republican Central Committee prefers the "Wells 35 Plan" and the "Preliminary House Plan" to the Adopted Plan. Routt County Republican Central Committee prefers the "Preliminary House Plan" for House District 57, rather than the Adopted Plan.

We hold that all of the above listed challenges, presented either pro se or through attorneys, do not present constitutionally significant issues, although the Commission may consider one or more of them on remand when it addresses redrawing the reapportionment map.[12]

### D.

### Drawing Districts On Remand

■■■■■■■■ On remand, the Commission must start with whole district assignment to

counties that qualify for them.[13] When necessary to meet equal population requirements, the Commission may make county and city divisions. When divisions of counties must be made, the Commission may employ the other criteria of Section 47 in their preferential order: minimizing city divisions (Article V, Section 47(2)), compactness and contiguity (Article V, Section 47(1)), and preservation of communities of interest (Article V, Section 47(3)). *See* Colo. Const. art. V, § 47; *In re Reapportionment 92–I*, 828 P.2d at 190. While these criteria are "neutral," they do involve policy choices that we will defer to if accompanied by an articulated reasonable rationale.[14] Because we remand the Adopted Plan for other reasons, we also require the Commission to reexamine the Adams, Arapahoe, and Mesa County divisions. If it is still necessary to make one, some, or all of them, then the Commission must make an adequate factual demonstration and articulate its rationale for the divisions, upon resubmission. We are aware that, in designing the Denver metropolitan area districts and complying with the constitutional criteria as set forth in this opinion, the Commission must make additional adjustments and determinations that most probably will involve some county and city splits.

We hold that the Adopted Plan does not comply with the substantive and procedural requirements of the Colorado Constitution. The Commission shall formulate an Adopted Plan which does so and resubmit it to us with supporting materials by 5:00 p.m. on February 15, 2002. *See* § 2–2–506(1)(a.5)(I).[15]

---

**11.** The Commission should address this objection on remand in curing the Boulder County and City of Boulder divisions.

**12.** Opposer Don Lee argues that the Commission held meetings which violated the Colorado Open Meetings Law, §§ 24–6–401 et seq, 7 C.R.S. (2001). This argument is not within our limited scope of review in reapportionment proceedings and is without merit. The Commission followed the Open Public Meetings requirements.

**13.** The Commission should continue Colorado's compliance with *Sanchez* in the affected state area.

**14.** "[T]he constitution provides the additional neutral criteria designed to minimize gerrymandering." *In re Reapportionment 92*, 828 P.2d at 211 (Mullarkey, J., concurring in part and dissenting in part).

**15.** Section 2–2–506(1)(a.5)(I) states in part that "[t]he general assembly therefore urges the commission and the Colorado supreme court to make every effort to complete the redistricting process no later than February 15, 2002."

### III.

Accordingly, we set aside the Commission's action, disapprove the Adopted Plan, and return it to the Commission for reconsideration and resubmission of a reapportionment plan by 5:00 p.m. on February 15, 2002 that complies with the substantive and procedural requirements of the Colorado Constitution, consistent with this opinion.

Justice BENDER dissents, and Chief Justice MULLARKEY and Justice MARTINEZ join in the dissent.

Justice BENDER, dissenting:

The majority adopts a two-part test to determine the constitutionality of a Commission decision to split a county. First, the Commission must have been "sufficiently attentive to county boundaries to meet the requirements of section 47(2)." To comply with this first prong of the test, the majority explains that the Commission must begin by allotting districts to counties that have sufficient population to support one or more house or senate districts. Further, the Commission must "tak[e] an overview" of the state as a whole in drawing districts and, thus, a "build-out" justification will no longer be acceptable under the majority's interpretation of the Colorado Constitution. Under the second prong of the majority's test, the Commission must, when it splits a county, advance "an adequate factual showing that less drastic alternatives could not have satisfied the equal population requirement of the Colorado Constitution."

Based on these newly created standards, the majority holds that splits of four specific counties (Boulder, Douglas, Jefferson, and Pueblo) in the Commission's proposed plan for senate districts ("Proposed Plan") are unconstitutional under the first prong of the test. The majority also finds that the Commission did not, under the second prong of the test, advance adequate explanations of the splits of three counties (Adams, Arapahoe, and Mesa) and two cities (Boulder and Pueblo). The majority approves the remainder of the Proposed Plan, including all of the house districts created by the Commission.

I respectfully dissent. I write separately to express my disagreement with the majority's interpretation of the Colorado Constitution. The new constitutional tests fashioned by the majority effectively overrule the primary holdings of our 1982 and 1992 reapportionment cases without directly saying so. In my view, the majority takes an overly simplistic view of the reapportionment process—one which adopts an unnecessarily rigid approach to redistricting, while simultaneously and inconsistently creating a test that defies precedent and fails to provide guidance as to how it should be applied in the future.

The majority's opinion is problematic for several reasons. First, the majority, though purporting to apply the correct standard of review, fails to follow its own articulation of that standard. Second, the majority creates an unpredictable two-part test, never before used by this court, to determine the constitutionality of a county split. Third, the majority simultaneously announces a bright-line rule that is inconsistent with precedent because it strips the Commission of discretion and because it prohibits types of splits that we have previously approved as constitutional. Fourth, the majority's rule will often protect the integrity of more populous counties, especially those in the Denver metropolitan area, at the expense of less populous counties. Finally, applying the second prong of the majority's two-part test, I disagree with the conclusion reached by the majority, that the Commission provided inadequate explanations for the splits of Adams, Arapahoe, and Mesa Counties and the Cities of Boulder and Pueblo.

Under the Commission's Plan, fifty-one of Colorado's sixty-three counties are not split. The alternative plans, upon which the majority places great weight, increase the number of undivided counties to only fifty-two. Although I readily admit that the Proposed Plan is not perfect, I cannot agree, on these facts, that it fails to comply with the constitutional standards that our previous cases have developed. I would approve the Proposed Plan because it substantially complies with the state constitutional requirements of equal population, avoidance of county and city

splits, compactness and contiguousness of districts, and preservation of communities of interest. *In re Reapportionment of the Colo. Gen. Assembly,* 828 P.2d 185, 190 (Colo.1992) [hereinafter *"In re Reapportionment 1992 "*]; *In re Reapportionment of the Colo. Gen. Assembly,* 647 P.2d 191, 193–94 (Colo.1982) [hereinafter *"In re Reapportionment 1982 "*]. Contrary to the approach taken by the majority in determining whether the Proposed Plan complies with the Colorado Constitution, our review should be limited in scope and deferential to the Commission's judgment. *In re Reapportionment 1992,* 828 P.2d at 189; *In re Reapportion 1982,* 647 P.2d at 194. Applying our constitutional precedent, the Proposed Plan meets constitutional muster.

## I. The Majority Fails To Apply Its Own "Narrow" Standard of Review

No plan adopted by the Commission can go into effect absent approval by this court. Colo. Const. art. V, § 48(1)(e). Once a plan is submitted to us, however, we have always required the scope of our review to be narrow. *In re Reapportionment 1982,* 647 P.2d at 194. We are not to redraw boundaries or choose what we view as a better plan from among alternative plans. If alternate plans all meet constitutional criteria, then the Commission, not this court, is vested with the discretion to adopt the plan of its choice. *Id.* ("The choice among alternative plans, each consistent with constitutional requirements, is for the Commission and not the Court."). Our job is to examine the plan submitted by the Commission only to determine whether it comports with constitutional criteria. *Id.* ("Our role in this proceeding is ... to measure the present reapportionment plan against the constitutional standards.").

In reviewing a plan to determine whether it complies with the Colorado Constitution, we do not require absolute compliance. Instead, any plan that substantially complies with constitutional mandates must be ap-

proved. *See In re Reapportionment 1982,* 647 P.2d at 197 (approving county splits because "the Commission substantially complied with the constitutional requirements"); *In re Interrogatories by the Gen. Assembly,* 178 Colo. 311, 313, 497 P.2d 1024, 1025 (1972) ("[W]e determine that substantial compliance was achieved with the constitutional benchmarks noted above.").

Further, the plan submitted to us by the Commission is presumed to be valid. *In re Reapportionment 1992,* 828 P.2d at 189 (recognizing "the presumption of good faith and validity we must accord to the Commission"); *see also In re Reapportionment 1982,* 647 P.2d at 197 ("Although we might make different choices were we in the Commission's place, we should not substitute our judgment for the Commission's unless we are convinced the Commission departed from [the] constitutional criteria.").

The majority purports to apply these standards, but fails to engage in a "narrow" review of the Proposed Plan. Its review instead creates new constitutional standards, which conflict with our precedent. The majority uses these new standards to support its conclusion that the Proposed Plan, in part, fails to comply with the Colorado Constitution. In the majority's view, the Commission's Proposed Plan is not entitled to a presumption of validity; nor is the Proposed Plan reviewed for substantial compliance with our state constitution.

Additionally, as demonstrated by the majority's use of a chart comparing the number of splits made under the various plans, the majority bolsters many of its conclusions regarding the constitutionality of the Proposed Plan by comparing it to other alternate plans.[1] Maj. op. at 1250; *see also* maj. op. at 1251–1253. Comparisons such as these are of questionable value since more than one plan may comport with constitutional criteria.[2] *In re Reapportionment 1982,* 647 P.2d at 194.

---

**1.** I find the majority's chart to be objectionable because it repeats the same bias in favor of more populous counties found throughout the majority's opinion. *See infra,* section IV.

**2.** The majority states, "Alternative plans illustrate how ... counties can be divided in a consti-

tutionally preferred manner." Maj. op. at 1252. The question that this court is supposed to answer, however, is only whether the Commission's plan complies with constitutional criteria, not

## II. The Majority Creates an Unworkable Test

The majority adopts a new two-part test requiring that: (1) a plan must be "sufficiently attentive to county boundaries"; and (2) county splits must be accompanied by "an adequate factual showing that less drastic alternatives could not have satisfied the equal population requirement of the Colorado Constitution." Maj. op. at 1241, 1246, & 1249.

Our court has never before articulated this two-part test. We have never previously even used both of these two phrases in the same case. Additionally, neither phrase was central to the holding of the particular case from which it was taken. Thus, the majority combines two unrelated phrases, contained in two opinions spanning ten years, to create a test that lacks meaningful standards and will be difficult for future courts to apply.

The first prong of the majority's test is taken from *In re Reapportionment 1982*. In that case, in response to opponents' arguments that the senate redistricting plan did not comply with section 47(2) of our constitution, we noted our belief that "the Commission was sufficiently attentive to county boundaries." *In re Reapportionment 1982*, 647 P.2d at 195. This remark was made in the context of a discussion of why the Commission's 1982 plan, given all of the constitutional criteria, was approved. *Id.* at 195–97.

The second prong of the majority's test, that the Commission must advance an "adequate factual showing that less drastic alternatives could not have satisfied the equal population requirement," is taken from *In re Reapportionment 1992*. In that case, we rejected a split of Pitkin County as unconstitutional because: (1) both a city and a county were split; (2) the resulting district lacked compactness; (3) the split destroyed a community of interest; and (4) the Commission's explanation of the split was not detailed enough to "provide a basis for meaningful judicial review." *In re Reapportionment 1992*, 828 P.2d at 195–96. Hence, the remark that forms the basis for the second prong of the majority's new test was also made in the

context of a discussion of the necessity of applying all of the constitutional criteria.

The majority's test has, thus, overemphasized isolated language from our previous cases in order to develop its two-part analysis. In doing so, it has created a test that lacks predictability and defined standards. For instance, it is unclear when the Commission will have been "sufficiently" attentive to boundaries, or when it will have provided an "adequate" explanation of its decisions. I conclude that the imprecision of the majority's test will make it impossible for this court to render any consistent review of the constitutionality of future Commission plans.

On one hand, the majority articulates its two-part test without defining when a Commission's plan will have been "sufficiently attentive to county boundaries." Thus, the Commission and future courts have little guidance as to when a plan will meet the first prong of the majority's test or when it will fall short of compliance. On the other hand, the majority's application of the rule demonstrates that there will be only one way for the Commission to satisfy the first prong of the majority's two-part test. The majority indicates that the first prong is met only when the Commission follows the bright-line rule that it must begin by allocating districts to the most populous counties. This bright-line rule is contrary to our precedent, as discussed below. In addition, the majority's rejection of the Commission's build-out justifications strips the Commission of the discretion historically afforded it to determine the order in which counties should be arranged into districts.

Based on the majority's application of its test to the Proposed Plan, I would assume that, any time that the bright-line rule is violated, the first prong of the two-part test will not have been satisfied and that the Proposed Plan is therefore unconstitutional. Thus, the articulation of the bright-line rule renders the first prong of the test unnecessary since the bright-line rule provides a complete answer to the question of whether

whether there is another constitutionally preferred plan. *In re Reapportionment 1982*, 647

P.2d at 194.

the Commission has been "sufficiently attentive to county boundaries."

To summarize, the majority has fashioned a two-part test that finds no support in precedent and that uses language that is vague and imprecise. It then institutes an unprecedented bright-line rule to be implemented under the first part of the test. The second prong of the test, however, remains unexplained, with no standards provided to determine when an explanation will be "adequate."

### III. Requiring the Commission to Proceed in a Particular Manner and Rejecting Build–Out Justifications Violates Our Precedent

The majority posits a bright-line rule that the Commission must first allocate districts to those counties that have a population greater than an ideal house or senate district. Maj. op. at 1249. If the county population will support, for instance, 2.5 districts, then the Commission is only permitted to allocate that county's population among three districts—two districts contained entirely within county borders and one district which combines part of the population of the relevant county with neighboring counties. A Commission decision that creates, for example, one whole district within county borders and two partial districts, or two whole districts within county borders and two partial districts, will almost always be considered, under the majority's analysis, unconstitutional.

The majority's approach demands that districts be drawn in a specific way, as detailed above, because anything less would purportedly fail to comply with the constitution. The majority asserts, in essence, that the Colorado Constitution sets forth a rigid hierarchy of apportionment criteria, under which the constitutionality of a redistricting plan can be judged predominantly, if not solely, by

counting the number of divisions for the most populous counties.

Based on this new rule, the majority rejects the Commission's divisions of Boulder, Douglas, Pueblo, and Jefferson Counties because these populous counties did not receive the number of entire senate districts for which they "qualify."[3] Maj. op. at 1241 & 1246.

The result reached by the majority is mandated neither by the language of the Colorado Constitution nor by our precedent. The constitution does not state that the redistricting authority must begin by drawing immovable lines that protect the more populous counties to the detriment of the less populous counties. Nor have previous cases decided by this court ever made such a suggestion, despite numerous opportunities to do so. Our precedent reveals just the opposite.

There are numerous state constitutional considerations that weigh upon the redistricting process. These include that: (1) each district should have equal populations, Colo. Const. art. V, § 46; (2) counties should not be divided or combined with other counties "[e]xcept when necessary to meet the equal population requirements of section 46," Colo. Const. art. V, § 47(2), and if counties must be split, the number of cities and towns within those split counties should be "as small as possible," Colo. Const. art. V., § 47(2); (3) each district should be "as compact in area as possible" and should "consist of contiguous whole general election precincts," Colo. Const. art. V, § 47(1); and (4) "communities of interest ... shall be preserved within a single district whenever possible," Colo. Const. art. V, § 47(3). *In re Reapportionment 1992*, 828 P.2d at 190.

This court has, however, cautioned against a formulaic, inflexible application of these criteria.[4] *In re Reapportionment 1982*, 647

---

3. As discussed in greater detail below, the majority also rests its rejection of the splits of these four counties on its new rule that the Commission must "tak[e] an overview" of the state when drawing districts, and cannot rely on a build-out justification. *See infra;* maj. op. at 1252.

4. We have recognized that the concerns listed at the top of the above list are more "important"

than those at the bottom of the list. *In re Reapportionment 1992*, 828 P.2d at 190. We have even gone so far as to describe them as a "hierarchy" of concerns. *Id.* This does not mean, however, that the criteria at the bottom will never be reached or that they are ordinarily irrelevant to the Commission's decisions on how to draw district lines. Apart from the paramount equal population concern, we have never held, as the majority now does, that concerns at the bot-

P.2d at 194 ("[T]he criteria of sections 46 and 47 are to be viewed as a whole, as a set of firm but general guidelines which allow the Commission some discretion in application.").

We have never held that there is only one acceptable approach to the drawing of general assembly districts. *In re Reapportionment 1982*, 647 P.2d at 196 (recognizing that a county's population may be "dense enough to allow the lines to be drawn in a number of ways without offending section 47(2)"). Nor have we ever imposed strict instructions on how to formulate a redistricting plan. In fact, we have historically afforded the Commission a degree of discretion as to how it proceeds when it draws district boundaries. *In re Reapportionment 1992*, 828 P.2d at 197 (approving the Commission's decision to draw districts for regions of the state in a predetermined order chosen by the Commission).

We afforded the Commission such discretion in 1982. The 1982 senate redistricting plan split eight counties (Arapahoe, Boulder, Delta, El Paso, Jefferson, Larimer, Pueblo, and Weld). *In re Reapportionment 1982*, 647 P.2d at 195–96. Seven of the split counties (all but Delta) were "large" counties with populations sufficient to support more than one senate district. *Id.* at 196.

Contrary to the majority's assertion, we approved the 1982 plan.[5] In doing so, we deferred to the Commission's choice of which counties to divide and, importantly, where and how to divide them:

[S]ubstantial equality of population and avoidance of splitting counties cannot al-

ways be met simultaneously. When they cannot, the avoidance of split counties must yield. The area of the state in which these conflicts occur is subject to adjustment, and the Commission must have the discretion to choose where the necessary and constitutionally permissible compromises are made.

*In re Reapportionment 1982*, 647 P.2d at 197; *see also In re Interrogatories by the Gen. Assembly*, 178 Colo. at 313, 497 P.2d at 1025 ("While the addition to or deletion from a particular district might be said to be ill-advised by some, the decision is ... one to be upheld provided a constitutional violation is not shown.").

Notably, we did not state that the Commission is required to begin its mapping attentive to the needs of the populous counties, while only secondarily moving to the consideration of less populous counties. Nor did we ever hint that there is only one constitutionally acceptable order in which the Commission must proceed.

To the contrary, we specifically recognized that the Commission was not required to draw lines in the way the majority now suggests. The 1980 census revealed that El Paso County's population was large enough that three districts could have been drawn entirely within county boundaries and a fourth partial district could have been created with neighboring counties. *In re Reapportionment 1982*, 647 P.2d at 196. Under the plan submitted, however, only one district was drawn entirely within county borders and three other partial districts,

tom of the list can never outweigh concerns higher up on the list. *See* maj. op. at 1247 ("The Commission may not apply the lesser criteria over the greater criteria."). To the contrary, we have specifically held that, in certain circumstances, concerns lower in the hierarchy must trump concerns higher in the hierarchy. *In re Interrogatory of the House of Representatives*, 177 Colo. 215, 217–18, 493 P.2d 346, 347–48 (1972).

5. The majority states that we found "a significant deficiency in the Commission's action that required remand for plan modification." Maj. op. at 1246. This is incorrect. In fact, we determined that the redistricting map complied with constitutional criteria and remanded only for revision of the sequencing of election districts. *In re Reapportionment 1982*, 647 P.2d at 192–93.

The majority then cites *In re Reapportionment of the Colo. Gen. Assembly*, 647 P.2d 209 (Colo. 1982) [hereinafter *"In re Reapportionment 1982 II"*], to support the proposition that this court may reject a resubmitted plan that is "less consistent" with constitutional criteria than a previously submitted plan. Maj. op. at 1245. The majority's statement is correct, but incomplete. In *In re Reapportionment 1982 II*, we outlined a special standard of review applicable only in the particular circumstances of that case. Specifically, we held that, it is *only* when the resubmitted plan is less consistent with constitutional criteria than the previously submitted plan that "deference to Commission expertise is inappropriate." *In re Reapportionment 1982 II*, 647 P.2d at 211.

containing portions of El Paso County and portions of neighboring counties, were also created. *Id.*

Thus, El Paso County presented the precise situation to which the majority now objects, and which would be unconstitutional under the majority's approach. Nevertheless, we approved the Commission's 1982 plan because it had been "drawn to achieve equal population" and did not constitute a "clear constitutional violation." *Id.*

Similarly, we sanctioned splits in the cities of Boulder and Grand Junction, even though each city was populous enough to support its own district. *Id.* at 197. This numerical fact did not convince us that constitutional standards had not been satisfied.

In *In re Reapportionment 1992*, we reiterated many of these points when we rejected several section 47(2) challenges to the proposed house plan.[6] *In re Reapportionment 1992*, 828 P.2d at 193–98. The plan submitted reflected the Commission's decision to begin drawing districts in particular areas of the state and then proceed to other areas of the state. *Id.* at 196–97.

When we considered the 1992 plan, in *In re Reapportionment 1992*, we did not simply conclude that, as a matter of arithmetic, there was a right or wrong number of split counties. Nor did we begin our analysis by focusing only on the most populous counties. Instead, we considered all the criteria of section 47, including avoidance of split counties, compactness, and preservation of communities of interest. *In re Reapportionment 1992*, 828 P.2d at 196 (analyzing a split of Pitkin County). Ultimately, we approved splits of Arapahoe, Baca, and Montezuma

Counties. *In re Reapportionment 1992*, 828 P.2d at 196 & 197–98.

Further, and inconsistently with the majority's bright-line rule, we concluded that the division of the City of Westminster into seven house districts did not violate the constitution, despite the fact that it could have been contained in far fewer districts. *Id.* at 196–97. We reasoned that "since Westminster's population exceeds that of an ideal house district, at least one split was required." *Id.*

We explained the remainder of the splits as being due, in large part, to the order in which the Commission had drawn its districts: "[T]he Commission initially fixed the boundaries of two districts in the eastern part of Adams County and worked west. Simultaneously, the Commission was moving east out of the mountains in creating District 62." *Id.* at 197. In light of the practical reality that the drafting of a redistricting plan must begin somewhere, and that some areas of the state will be subject to multiple splits in order to minimize splits in other areas of the state, we held that these numerous splits were "not per se unconstitutional." *Id.* We recognized that the Commission's decision about the order in which lines were drawn meant that there would be more splits to areas considered last:

> Because of the Commission's choices of where to begin drawing house districts, and in order to bring "closure" to the Final Plan and preserve equality of population, Westminster was split into more parts than if the Commission had proceeded differently.

*Id.* Nevertheless, we approved the seven splits reflected in the reapportionment plan.

---

**6.** Again, the majority misstates the outcome of this case. We did not remand the plan because of a "significant deficiency." Maj. op. at 1246. In fact, we found fault with only minor aspects of the submitted plan. First, we corrected the inadvertent division of the town of Perry Park. Second, we objected to the division of Pitkin County (and the City of Aspen within Pitkin County) and remanded the case so that the Commission could reconsider it. With those exceptions, we approved the plan. *In re Reapportionment 1992*, 828 P.2d at 189.

The Commission submitted a revised plan that retained the split of Pitkin County, though it

eliminated the split of the City of Aspen. *In re Reapportionment of the Colo. Gen. Assembly*, 828 P.2d 213, 216 (Colo.1992) [hereinafter "*In re Reapportionment 1992–II* "]. The Commission explained that it considered, but ultimately rejected, other plans because they would entail splitting additional counties or cities, fail to achieve a "net improvement in preservation of communities of interest" or split communities of interest entirely, or be unable to remedy concerns of limited access between Pitkin County and the rest of District 61. *Id.* We considered that explanation adequate and approved the revised plan. *Id.*

Ignoring our earlier holdings, the majority now finds that it was improper for the Commission to proceed in the manner that it did in this case. Specifically, the majority states:

It ... appears from the Commission's rationale that it considered itself at liberty to start the cartography of reapportionment at any point of Colorado geography it might choose.... [T]he constitutional criteria instead contemplate the Commission taking an overview of Colorado's population by county, then generating a map that respects the state's legal preference for county integrity, then applying minimization of city divisions, compactness, contiguity, and community of interest criteria to add portions of counties to other counties in forming districts, when necessary.

Maj. op. at 1251–1252. The majority thus eliminates the discretion that this court has historically afforded the Commission and announces a rule that requires the Commission to "tak[e] an overview" of the state in an attempt to minimize overall county splits.

Based on this new "overview" rule, in combination with its other new rule, that the Commission must begin the reapportionment process by allocating districts to the most populous counties, the majority concludes that splits of Boulder, Douglas, Pueblo, and Jefferson Counties are unconstitutional.[7]

The rules announced by the majority represent an extraordinary departure from precedent and upset decades of settled expectations about the application of constitutional criteria. In my view, the majority's approach is both unwarranted and ill-advised.

## IV. The Majority's Bright–Line Rule Protects More Populous Counties at the Expense of Less Populous Counties

All parties concede that some sparsely populated counties must be combined with other counties, or parts of other counties, in order to create senate districts of constitutionally permissible population. Similarly, other, more populous counties must be divided into smaller segments in order to create districts of the right number of people. Such is the natural result of Colorado's population distribution and the constitutional mandate that districts must be of equal population. The question that the parties now debate is where and how various divisions and combinations should occur.

The majority resolves this question by concluding that preference must be given to more populous counties, at the expense of less populous counties. I cannot agree with this result for I believe that it unfairly and unnecessarily disadvantages the members of less populous communities in the redistricting process.

To take a simple example, assume three same-sized, square-shaped counties in a contiguous conformation. County B (the middle county) has sufficient population to support 1.5 districts. County A (the westernmost county) has sufficient population to support 0.25 districts. County C (the easternmost county) also has sufficient population to support 0.25 districts. Under the majority's analysis, the Commission must first create one district entirely contained within County B's boundaries. Then, the Commission must create a separate district using the remaining population (0.5 district) from County B and combining it with population from neighboring counties.

To satisfy the majority's test, this leftover 0.5 district could be used in one of two ways. First, the leftover population of County B could be cobbled together with both Counties A and C. Under this scenario, Counties A and C would be connected by a narrow land bridge through County B, resulting in a dumbbell-shaped district that ignores the compactness requirements of the state constitution. Alternatively, the leftover 0.5 district could be joined with County A (or C) plus all or part of a more distant county or

---

7. I note that the majority's "overview" approach and its bright-line rule that the Commission must begin by apportioning districts to the most populous counties are arguably inconsistent. It is certainly possible to envision a scenario where an overview of the state would, in actuality, reveal that more splits exist in a plan created by a Commission that followed the bright-line rule than might exist in an alternate plan.

counties,[8] in a sacrifice meant to provide the larger county, County B, with the maximum number of whole districts that could simultaneously exist within its boundaries.

A more logical choice for the Commission might be to split County B into two, with half of its population being coupled with County A and half with County C. Thus, one district would consist of all of County A and half of County B, and the second district would consist of all of County C and half of County B. Under the terms of the majority's analysis such a logical result would not ordinarily be constitutional because County B would be split into two partial districts instead of one whole district and one partial district.

Note that, under the logical approach described above, the constitution's provision regarding compactness is effectuated and neither County A nor County C needs to turn to additional neighboring counties in order to complete a district. Further, the logical approach involves only one split county (County B), while the majority approach demands a split of County B plus potential splits of additional neighboring counties and/or sacrifices of compactness of districts.

While this basic example obviously cannot capture all of the mathematical nuances involved in the redistricting process, its teachings are equally applicable to the more complicated fact pattern presented by our state county boundaries. I take this opportunity to acknowledge the sheer difficulty and enormity of the task that the Commission undertakes.

The political geography and population distribution of our state, as well as the competing concerns defined by our federal and state constitutions, mean that there are literally thousands of variables affecting the drawing of legislative districts. At the time of the 2000 census, Colorado had sixty-three counties that ranged in size from 150 square miles (Gilpin County) to 4,773 square miles (Las Animas County). Though some of these

counties are shaped as almost perfect squares (e.g., Morgan County), others are irregularly shaped (e.g., Denver County), rendering the Commission's task even more complex. Population densities vary among the counties, with some having fewer than one person per square mile and others having thousands of people per square mile. Additionally, to comply with constitutional criteria not at issue here, the Commission was required to take into account the distribution and voting patterns of minority groups.

To all of these complications is added the further challenge that Colorado's varied topography means that residents of the state may live in rural agricultural areas, in urban centers, in small mountain resort cities, in planned suburban developments, or a plethora of other types of areas. Residents of these different communities may have significantly different attitudes towards issues such as water usage, growth, transportation, and the environment.

The Commission, before arriving at its Proposed Plan, held dozens of meetings across the state, where it heard testimony from people representing all sorts of different interests and communities. It publicized a Preliminary Plan, which it then revised in response to suggestions and criticism. In creating its Proposed Plan, the Commission considered literally hundreds of maps involving different permutations of senate districts.

The majority's formulaic approach fails to recognize the mathematical nuances involved in creating districts that maximize compliance with the relevant constitutional criteria. The complexity of the geography of our state, the diverse types of communities, the different and sometimes competing federal and state constitutional requirements, and the almost infinite number of district permutations that can be generated all combine to require this court to defer to the discretion of the Commission, provided that the Proposed

8. For instance, assume that County X, located to the northwest of County A, has a population sufficient to support 0.6 district. The leftover 0.5 district from County B could be combined with the 0.25 district from County A. To complete the district, the Commission could take the final 0.25

district from County X. As part of the resulting chain reaction, County X would then have to seek out other neighboring counties with which it could merge its remaining 0.35 district to create a whole district.

Plan was drawn on the basis of the appropriate constitutional criteria. Instead of taking this approach, the majority's new rule favors the most populous counties, using the populations of less populous counties largely as fillers that round out the leftover populations from more populous counties.

The result of the majority rule is that less populous counties will be fractured or combined so as to cater to the populations found in more populous counties. Further, depending on population distribution, the majority's technique will oftentimes lead to sprawling districts that present compactness concerns.

The majority rejects the divisions of Boulder, Douglas, Pueblo, and Jefferson Counties in the Proposed Plan because the Commission did not begin by first allocating districts to the most populous counties. Because I believe that the first prong of the majority's test is ill-advised and unsupported by precedent, I disagree with the majority's conclusions regarding the constitutionality of the divisions of those four counties.

## V. The Commission's Explanations for Splits of Adams, Arapahoe, and Mesa Counties and the Cities of Boulder and Pueblo Are Persuasive

Even if I was to agree with the two-prong test that the majority adopts, I do not believe that the majority correctly applied the second prong in this case. Specifically, the majority suggests that the explanations advanced to justify the splits of Adams, Arapahoe, and Mesa Counties, and the Cities of Boulder and Pueblo, are inadequate. I disagree because I would accept the Commission's explanations as satisfying the substantial compliance standard that applies when we evaluate whether the Commission's work comports with constitutional criteria. I would hold that the Commission's decision to draw districts in a predetermined order and the Commission's explanations for county splits are entitled to deference. *See In re Reapportionment 1992,* 828 P.2d at 197; *In re Reapportionment 1982,* 647 P.2d at 197.

Various Commission explanations of splits have been approved by this court in the past. As discussed above, build-out justifications were explicitly deemed acceptable in *In re Reapportionment 1992.*[9] Additionally, in *In re Reapportionment 1992–II,* after initially remanding the case so that the Commission could reconsider its split of Pitkin County, we accepted as sufficient the Commission's explanation for why that county split was retained. *In re Reapportionment 1992–II,* 828 P.2d at 216. The Commission described the various alternatives it considered and explained how constitutional criteria applied to each alternative. Based on its reasoning that retaining the Pitkin County split would help effectuate all of the constitutional criteria, including the preservation of communities of interest, we approved it. *Id.* In this case, the Commission should be held to the same standard. In explaining why counties and cities are split, either when the Proposed Plan is originally submitted or upon resubmittal, the Commission should not be required to make a more strenuous showing than was required ten years ago.

The Commission's Proposed Plan splits Adams County into two whole districts (Districts 24 and 26) and two partial districts (Districts 23 and 25). When the Commission drew districts in the southwestern metropolitan area, it completed three whole districts in Jefferson County. It then used some of Jefferson County's leftover population to create a district containing a portion of Jefferson County and a portion of Adams County. This accounts for one of the partial districts. The Commission then created the two whole districts in Adams County. Because the population in the remaining part of Adams County was less than necessary to form its own district, it was combined with the Arapahoe County portion of the City of Aurora.[10] This was a logical combination since the City of Aurora spans more than one county.

Under the rationale of *In re Reapportionment 1992,* I do not believe that this build-out justification is inadequate. Additionally,

---

9. The majority rejected build-out justifications as unacceptable under the first prong of its test. Presumably, such justifications are therefore also impermissible under the second prong.

10. Adams County residents dominate the resulting district.

I note that the plans to which the majority compares the Commission's Proposed Plan for Adams County do not, in fact offer any significant advantage over the Proposed Plan. Specifically, both the Rodriguez 5 Plan and the Wells 37 Plan create two whole districts and two partial districts in Adams County, just like the Commission's Proposed Plan.

Similar build-out justifications drove the creation of three, instead of four, whole senate districts within Arapahoe County. The initial decision to split Arapahoe County was made because Denver County's population could accommodate four whole senate districts and one partial district (District 32). The Commission elected to complete District 32 by combining the remaining Denver County population with population from similar communities to the south of Denver in Arapahoe County. Notably, the choice to push south out of Denver into Arapahoe County was a decision the Commission made early in the process and one that minority commissioners repeatedly embraced in subsequent plans. While the Proposed Plan may have more partial districts in Arapahoe County than other plans, this alone does not render it unconstitutional. Substantial compliance, not perfection, is the standard to which the Proposed Plan should be held. *In re Reapportionment 1982*, 647 P.2d at 197.

Mesa County has sufficient population to support 0.95 senate districts. Thus, its population is slightly less than the ideal population for one whole senate district. Therefore, it requires additional population to form a district. Unfortunately, as the Commission explains, every adjacent county has a population that, when added to Mesa County's population, is too large for an ideal district. This means that either Mesa County must be split and joined with other counties, or that some other county (such as Delta County) must be split and joined with Mesa County. Either way, a county must be split. In my view, our state constitution does not require the splitting of a smaller county merely because its size is less than that of an ideal

senate district. Therefore, I disagree with the majority's conclusion that the Commission has not advanced an adequate explanation to justify the splitting of Mesa County.

The Commission has explained that it split the City of Boulder in order to preserve the integrity of the City and County of Broomfield.[11] Broomfield's population was insufficient to complete a district, so the Commission had to cross into some other county. One possible source was the area of Boulder County north of Broomfield, including Longmont, Louisville, Erie, and Lafayette. However, the Commission determined, based on almost uniform public comment, to keep those similar communities together in their own district (District 17), contained wholly within Boulder County. The option of going south into Jefferson County was foreclosed because that area had already been used to complete District 23.

As the Commission described in its argument to this court, that left them with two options: (1) pushing into Adams County to the east; or (2) pushing to the northwest into the City of Boulder. The Commission, based on the perceived community of interest existing between Broomfield and Boulder along the Highway 36 transportation corridor, decided to combine part of the City of Boulder with Broomfield to create District 18. The population then remaining in Boulder County was insufficient to comprise an entire district. The remainder of Boulder's population was, therefore, placed in District 19. While these are not necessarily the best choices that the Commission could have made, I believe that they are constitutionally permissible choices.

Finally, the majority finds inadequate the explanation of the Commission's decision to split the City of Pueblo. Pueblo County, which contains the City of Pueblo, has population sufficient to support 1.15 districts. Thus, the county must be split somewhere. The Commission justified its decision to split the City of Pueblo by noting that this was the only place that the split could happen such that Pueblo County could be com-

---

**11.** Broomfield became a county in November of 2001. Thus, its population was not tabulated as a separate county in the 2000 census. Neverthe-

less, the Commission chose to preserve its city and county borders.

bined with eastern plains counties. I again note that when counties must be split, the Commission is afforded the discretion to determine where to make difficult, though constitutionally permissible, splits. I do not believe that the splitting of the City of Pueblo offends constitutional principles.

## VI. The Proposed Plan Substantially Complies with the Appropriate Constitutional Standards

As explained in Section I, above, our role in reviewing the Proposed Plan is supposed to be narrow. *In re Reapportionment 1982*, 647 P.2d at 194. We are not to choose among alternative plans and we are to afford the Proposed Plan a presumption of validity. *Id.* Our task is to examine the Proposed Plan only to determine whether it substantially complies with constitutional criteria. *Id.*

No party alleges that federal law has been violated with respect to the Proposed Plan, nor does my independent examination reveal any federal constitutional problems. Therefore, I turn to the mandates of the Colorado Constitution. The paramount requirement of the Colorado Constitution is that each district be of equal population. Colo. Const. art. V, § 46. No serious objection is raised that the districts in this case do not comply with the equal population requirement.

The next three requirements, avoidance of city and county splits, compactness and contiguity of districts, and preservations of communities of interest, are the subject of much debate among the parties to this case.

We have previously held that the Commission has the discretion to draw districts in the order that it chooses, even if this means that there are more splits to the resulting plan than might otherwise exist. *In re Reapportionment 1992*, 828 P.2d at 197; *see also In re Reapportionment 1982*, 647 P.2d at 196 (recognizing that there are situations where districts can be "drawn in a number of ways without offending section 47(2)"). Further, we have stated that the constitu-

tional criteria are to be "viewed as a whole, as a set of firm but general guidelines which allow the Commission some discretion in application." *Id.* at 194; *see also In re Reapportionment 1992*, 828 P.2d at 195–96 (considering all the criteria in determining the constitutionality of a county split). In applying these standards, we have acknowledged that multiple plans can simultaneously comply with constitutional criteria. *In re Reapportionment 1982*, 647 P.2d at 194. These principles form the backdrop for my analysis of the Commission's Proposed Plan.

As mentioned above, the Commission's Proposed Plan preserves intact fifty-one out of our sixty-three counties.[12] The focus of the majority's opinion, this dissent, and the arguments of the parties has thus been upon the few counties in which splits do occur.

Unfortunately, it is not possible to accommodate everyone. Such is the dilemma faced by the Commission. If the Commission satisfies the desires of one county, city or community of interest to remain whole and undivided, it often must necessarily split another county, city, or community of interest. Put simply, one of the county lines must yield.

The Commission has explained that some of the divisions of Boulder, Douglas, Pueblo, and Jefferson Counties resulted from its decision to begin drawing districts in a particular region of the state before proceeding to draw districts in other regions.[13] The Commission engaged in numerous discussions and votes regarding the order in which they should work. These decisions are entitled to deference from this court.

The splits resulting from the order in which the Commission proceeded could have been avoided, in small part, if the Commission had drawn the districts differently. Nevertheless, as our precedent discloses, this reality does not mean that the Commission has failed to substantially comply with constitutional standards. *In re Reapportionment 1992*, 647 P.2d at 197. In my opinion, constitutional standards have been satisfied.

---

12. Other plans advanced by the opponents of the Commission's plan increase the number of undivided counties to only fifty-two.

13. I have already addressed the divisions of Adams, Arapahoe, and Mesa Counties, as well as the divisions of the Cities of Boulder and Pueblo, in Section V, *supra*.

**1266**

The alternate plans presented by the objectors in this case may well be acceptable under the Colorado Constitution. However, the presentation of an alternate, constitutionally acceptable plan does not render the Commission's Proposed Plan unconstitutional, even if many people believe that the alternate plan is better. *See, e.g., In re Reapportionment 1982,* 647 P.2d at 197 ("[T]he Commission must have the discretion to choose where the necessary and constitutionally permissible compromises are made.").

Ultimately, the reality is that, because of the political nature of the redistricting process,[14] there will also be some people who are dissatisfied with decisions about which counties should be split. This alone does not render a particular plan unconstitutional.[15]

When the Commission's Proposed Plan is accorded the deference that it is due and when the proper constitutional standards are applied, it becomes apparent that this court should approve the Commission's Proposed Plan.

### VII. Conclusion

Were we, the court, in the Commission's shoes, we might not make the same choices that it has made. Nevertheless, our job is not to second-guess the result, but to test its constitutionality. I believe that the Commission's Proposed Plan for both the house and the senate complies with the standards of constitutionality set forth in our precedent and, therefore, should be approved.

I am authorized to say that Chief Justice MULLARKEY and Justice MARTINEZ join in this dissent.

---

14. *See generally* Gene R. Nichol, Jr., *The Practice of Redistricting,* 72 U. Colo. L.Rev. 1029 (2001).

15. It is not inappropriate for the Commission to take political considerations into account, so long as it does not elevate these considerations to

the level of constitutional concerns. *In re Reapportionment 1992,* 828 P.2d at 199 ("It is only when partisan factors are allowed an importance equal to or greater than the proper constitutional criteria that a plan is defective.")